Filed 9/25/14  P. v. Shackelford CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038811 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1199993) |
| v. | |
| DAVID J. SHACKELFORD, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

A jury convicted defendant David J. Shackelford of first degree murder (Pen. Code, § 187, subd. (a)[1]) and found true the allegation that he personally used a deadly weapon (§ 12022, subd. (b)(1)).  The trial court sentenced defendant to a term of 25 years to life for the murder, with a consecutive one year term for the deadly weapon allegation.

On appeal, defendant contends:  (1) his conviction must be reduced to second degree murder because there was no substantial evidence of premeditation and deliberation; (2) the prosecutor committed misconduct by misstating the reasonable doubt standard; (3) trial counsel was ineffective for failing to request CALCRIM No. 522, which would have told the jury that provocation may reduce a murder from first degree to second degree; (4) the trial court erred by telling the jury, pursuant to CALCRIM

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

No. 521, that defendant deliberated the murder if he decided to kill before *completing* the acts that caused the victim's death; (5) trial counsel was ineffective for failing to object when the prosecutor argued that defendant premeditated the murder *after* stabbing the victim; (6) the trial court erred by allowing the prosecutor to introduce evidence that defendant hit someone with a baseball bat when he was a teenager; (7) trial counsel was ineffective for asking defendant questions that opened the door to introduction of the baseball bat incident, and for failing to request a limiting instruction regarding the baseball bat incident; and (8) there was cumulative error. We will affirm the judgment.

## II.     BACKGROUND

Defendant was convicted of murdering his girlfriend, Melanie Dunn, by stabbing her in the neck with a knife. The incident occurred in the early morning hours of February 10, 2011, in the home where Melanie lived with her family.[2] Defendant initially claimed that Melanie had stabbed herself, but at trial he claimed her death was accidental.

### A.     *Testimony from the Dunn Family*

Defendant had been living with the Dunn family for a month or two prior to Melanie's death. Melanie worked as a waitress at the Clift Hotel in San Francisco. Defendant worked infrequently and had no car. About two weeks before her death, Melanie stated that she had "had enough" of paying for everything for defendant and of being the responsible one in the relationship. Melanie said defendant was "lazy," and she wanted defendant to move out. However, she thought defendant would kill her or kill himself if she separated from him.

Melanie left for work at about 5 p.m. on February 9, 2011. About an hour earlier, Melanie had slammed her bedroom door upon exiting, leaving defendant inside the room.

---

[2] As several members of the Dunn family testified at trial, we will refer to each of them by their first names, for clarity.

Melanie's brother, Jonathan Dunn, was home from college at the time of Melanie's death. On the night of February 9, 2011, Jonathan fell asleep on the living room couch, which abutted the wall of Melanie's bedroom. He heard Melanie come home at about 4:00 a.m. About an hour later, Jonathan heard a knocking sound or "thumps" coming from Melanie's room. It sounded like something was hitting the wall of her bedroom. He heard five to 10 thumps, but he did not hear any screaming, yelling, or arguing.

Jonathan tried to open Melanie's bedroom door, but it was locked. He knocked and called out Melanie's name, but there was no answer, although he heard more banging. Jonathan alerted his father, Kenneth Dunn, who had also heard a banging sound and had woken up.

Jonathan or Kenneth forced the bedroom door open. Inside the bedroom, Melanie and defendant were lying on the bed on their sides, facing the door. Defendant was behind Melanie. Melanie's eyes were open but rolling back in her head. Her face was full of blood, she had blood coming out of her nose and mouth, and she was gargling. Defendant was not rendering any medical assistance to Melanie.

Jonathan and Kenneth began attacking defendant, who stated, "You don't understand." After they pulled defendant away from Melanie, Jonathan noticed that Melanie had a knife in her neck and told Kenneth it was "bad." Kenneth told defendant to get out of the room, sat Melanie up in bed, removed the knife from Melanie's neck, then put pressure on the wound with a towel. Kenneth told his wife, Regina Dunn, to go get his gun, but she called 9-1-1 instead.

While Regina was on the phone with the 9-1-1 dispatcher, defendant began to leave the house. Regina asked where he was going, and defendant said, "to the store." Regina told defendant to get back inside, and he did, briefly, but then he ran out.

Jonathan called 9-1-1 also. He told the dispatcher that he thought Melanie stabbed herself by accident, but at trial he explained he had been confused and in denial. He did

3

not want to believe defendant would do something like that to Melanie. Defendant was in the room when Jonathan told the 9-1-1 dispatcher that he thought Melanie had stabbed herself.

Melanie had never told Jonathan or Kenneth that she wanted to hurt herself. She had not mentioned that she felt unsafe in the neighborhood or that she kept any knives in her bedroom. At times, Melanie had mentioned not being happy with her life, but she had not complained about being depressed. Two years before her death, on her 25th birthday, Melanie had gotten emotional after being up all night after work. Melanie would say that she believed suicide was "a copout."

Melanie had been close with her sister, Dawn McMahan. They communicated and saw each other frequently. Melanie had been very happy the last time McMahan saw her, which was on February 4, 2011—six days before Melanie's death. About two weeks before her death, Melanie told McMahan that she wanted defendant to move out. She had realized defendant was not right for her and was tired of taking care of him. She had also rekindled a relationship with an ex-boyfriend.

### B. Investigation

An officer arrived at the Dunn residence at 5:25 a.m. Melanie was non-responsive, she had "lots of blood" on her neck and body, and bubbles were coming out of her mouth. There was a "radiating bloodstain" on the wall above the head of her bed and a "swipe stain" on the wall along her bedside. Melanie was taken to the hospital, where she was pronounced dead at 5:51 a.m.

Other officers were advised to be on the lookout for defendant and located him walking away from the Dunn residence. Defendant had blood all over him. He did not tell the officers that Melanie needed help, but he asked, "what happened" after he was handcuffed. Defendant did not have any apparent injuries, but when he was photographed that same morning, police observed two cuts on his left upper arm and scratches on his neck. The cuts on defendant's arm appeared to be fresh.

4

An officer collected the knife from Melanie's bedroom. The knife, which had an eight-inch blade, matched a set of knives in the kitchen. The knife had been extremely sharp, and Kenneth had used it to trim meat the weekend before Melanie's death. Only Melanie's DNA was found on the knife, but it was possible that defendant's DNA was "drown[ed] out" because the knife contained a high level of Melanie's blood.

A second knife was found between the mattress and box spring of Melanie's bed. Kenneth had previously "retired" that knife. DNA from three individuals was found on the knife. Melanie was the major contributor. Defendant could not be included or excluded, but it was 980,000 times more likely that the DNA was from Melanie, defendant, and a third party than from Melanie and two unknown individuals.

At the time of her death, Melanie had been wearing a long-sleeved shirt and a tank top. The long-sleeved shirt had two holes in the collar area, and the tank top had two holes in the front abdominal area and smaller holes on the back side.

Fingernail clippings from Melanie were tested for DNA. Defendant was a possible contributor to the DNA found under her left fingernails; the probability was one in 4.4 billion in the African American population.

Dr. Michelle Jorden performed an autopsy. Melanie was five feet four inches tall and 128 pounds. The stab wound in Melanie's neck was one inch long, with diagonal superficial wounds emanating from the main wound. The superficial wounds indicated the knife had been dragged along the surface of Melanie's neck before or after the knife entered. These were not "hesitation marks," i.e., nonfatal wounds often inflicted by persons committing suicide.

The knife had gone through Melanie's skin, esophagus, cartilage, vertebrae, and muscle. There were two exit wounds at the back of Melanie's neck. This indicated that the knife had been partially withdrawn, then pushed back in. The angles of the two exit wounds indicated that the knife had been twisted before the second push or Melanie's head had been moved.

Dr. Jorden opined that Melanie's death was a homicide, not a suicide or an accidental death. She based her opinion on the location of the wound, the course of the wound, the characteristics of the wound, the holes in Melanie's clothing, and information provided by the police. It is rare to see a suicide by stabbing, and people who do stab themselves generally do so in the chest or abdomen, not the neck. People who do cut their own necks usually inflict long wounds, not deep ones, and there are commonly hesitation marks. The upward angle of the wound was very unusual for a suicide, as well as difficult to self-inflict. It would also have been difficult for someone to plunge a knife all the way through his or her own neck, then partially remove it, then plunge it back in. People who stab themselves usually remove their clothing first; they do not stab themselves through clothing. The holes in Melanie's clothing were all from exit wounds, and the holes in the lower part of her tank top indicate it was moved up during a struggle.

Dr. Jorden opined that defendant placed Melanie in a choke hold before stabbing her. Melanie had squirmed, causing her shirt to be pushed up. Defendant had stabbed her while holding her. When the knife exited Melanie's neck, it cut defendant's arm.

### C.    *Defendant's Police Interviews*

Defendant was interviewed at the police station.[3] He stated that he was six feet three inches tall and that he weighed 225 pounds. He told the police that he and Melanie had dated for about a year. He said Melanie had been upset when she came home from work. After she had come home, defendant had gotten up to get food. He had locked the bedroom door upon returning. He began watching television, then heard a "wincing sound" and looked at Melanie. He saw blood and the knife, which was on the bed, and went to Melanie's aid. Kenneth and Jonathan then entered the room.

---

[3] Defendant's police interview was videotaped and played for the jury at trial. The jury received transcripts of the interview.

Defendant claimed Melanie had been sending him suicidal text messages. The police obtained text messages from defendant's cell phone and found two messages in which Melanie referred to wanting to hurt herself or commit suicide.[4] One message had been sent on January 29, 2011. The other message had been sent at about 2:00 a.m. on February 8, 2011.

Defendant admitted he had been exchanging text messages of "a sexual nature" with other women. He denied knowing anything about Melanie having a relationship with someone else, but there were text messages on his phone in which Melanie stated that she wanted to spend the night with someone else and that she had been having sex with two other people. When confronted with these text messages, defendant admitted he had felt betrayed and that Melanie had wanted him to move out.

### D.     Defense Testimony

Melanie's supervisor testified that on the night of February 9, 2011, Melanie had begun her work shift at 7:00 p.m. She had left work at about 2:30 or 3:00 a.m. on February 10, 2011. She had filled out her time sheet when she began working, but she did not fill it out at the end of her shift. It was unusual for Melanie not to complete her paperwork. Melanie's supervisor testified that he did not notice anything unusual about her demeanor that night, but he told the police that Melanie had been distracted and that she had constantly been on her cell phone.

Defendant testified and admitted a 2005 conviction of petty theft with a prior, a 2006 conviction of petty theft with a prior, and a 2008 conviction of forgery. Defendant also admitted he had given false information to a police officer in 2008, although he had not been charged or convicted of that crime. He was on parole at the time of Melanie's death.

---

[4] At trial, the jury received a binder containing over 9,000 text messages from defendant's cell phone. There were 1,439 text messages from defendant to Melanie and 1,315 text messages from Melanie to defendant.

Defendant described his relationship with Melanie as "pretty exclusive" at the beginning but an "open relationship" later. He admitted that while in the relationship with Melanie, he had flirted with other girls, sent flirty texts to other girls, and had sex with two other women.

At one point, defendant had sent a picture of his penis to another girl. Melanie had found out and gotten upset. Defendant told his cousin about Melanie getting upset. Defendant's cousin texted him something like, "[S]he should get her ass whooped," or "I would have to get someone to beat her ass for that shit," followed by "L.O.L.," which means "laugh out loud." Defendant had texted back, "Shit. We still might have to get someone to beat her ass[.] L.O.L." Defendant had also texted his cousin about Melanie wanting to get back together with her ex-boyfriend. Defendant wrote, "I want to beat her ass!!"

Defendant further described his relationship with Melanie as a "roller coaster." He claimed Melanie said she was depressed and had threatened suicide four or five times. Just a few days before her death, she had texted him about harming herself. She used marijuana on a daily basis and cocaine once or twice a week.

Defendant claimed Melanie kept knives in her bedroom because she lived in a rough neighborhood. She kept one knife under the bed. Defendant had touched both knives.

Defendant claimed he was intending to move out on February 15, which was the date he had been told to leave by. He was hoping to stay together with Melanie after moving out.

On the day before Melanie's death, defendant and Melanie had a fight about him leaving. Melanie slammed a door before leaving for work. She and defendant texted one another afterwards, and they spoke on the phone. During the conversation, Melanie said she wanted to see her ex-boyfriend. Melanie also sent him texts that night, saying she was going to have sex with someone else, that she was moving on, and that she had

8

already slept with other people.  She called defendant an "asshole" and told him, "[J]ust leave me alone."  At some point that night, defendant changed his Facebook status, stating that he had "hurt in my heart, ice in my veins."

When Melanie came home from work, defendant asked her how her day was.  Melanie was dismissive.  They started arguing about him moving out, although not loud enough for anyone to hear.  Melanie seemed intoxicated.  At some point during the argument, Melanie pulled out a knife from under her pillow and began waving it around.  Melanie was enraged, but defendant tried to keep calm.  Melanie said she would "rather be dead than have to deal with our bullshit what we are going through."  Melanie told defendant she had been "out messing [around] on" him and she told him, "Your mother should have aborted you."  Melanie continued to wave the knife in front of herself, and after the last comment, defendant "snapped."  He grabbed Melanie's hand and pushed it away from him.  It was a hard push, but he did not aim at Melanie and was not intending to hurt her.  He was both protecting himself and pushing the knife away in anger.  Defendant acknowledged that the knife had gone all the way through Melanie's neck and that Melanie did not kill herself.

When defendant saw blood, he got onto the bed to hold Melanie, which caused a thump.  Defendant did not see the knife in her throat, realize the knife had gone through her neck, or feel that the knife was cutting his arm when he was holding her.  Defendant admitted he did not call 9-1-1, call out for help, or try to stop the bleeding.

When defendant heard a knock at the door, he said, "Come in," but he had forgotten that the door was locked.  Kenneth and Jonathan came inside and assaulted defendant.  Kenneth asked what defendant did to his daughter.  Defendant told him, "You don't understand."  Kenneth told defendant to leave, so defendant went out to the living room.  He heard Jonathan calling 9-1-1 and Regina trying to call 9-1-1.  Defendant told Regina, "[T]ell them to hurry."

9

Defendant was stressed out, so he decided to go get a cigar from the store. He intended to return to the house. He was in shock. He did not attempt to run or hide from the police. After being arrested, he asked the police, "What's going on," because he wanted to know Melanie's condition. Defendant claimed that after he was arrested, he scratched his neck, which was irritated by the paper jumpsuit he had to wear. He had sensitive skin and long nails at the time.

Regarding his police interview, defendant admitted he had not been completely honest. In fact, 90 percent of what he told the police was false. He was not truthful because he was "trying to distance" himself from the situation. At trial, defendant clarified that he was no longer claiming Melanie committed suicide; he was saying that her death was accidental.

## III.    DISCUSSION

### A.    *Sufficiency of the Evidence:  Premeditation and Deliberation*

Defendant contends there was insufficient evidence to support the jury's finding that the attempted murder was willful, deliberate, and premeditated, and thus that defendant's first degree murder conviction should be reduced to second degree murder.[5]

### 1.    Standard of Review

Under the federal Constitution's due process clause, there is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In addressing a claim of insufficient evidence, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses

---

[5] Defendant does not challenge the sufficiency of the evidence on the alternate theory, argued below, that the murder was of the first degree because it was committed by lying in wait.

substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

### 2. Analysis

" ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.] ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " [Citation.]' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*).)

"*People v. Anderson* (1968) 70 Cal.2d 15 . . . (*Anderson*) discusses three types of evidence commonly shown in cases of premeditated murder: [1] planning activity, [2] preexisting motive, and [3] manner of killing. [Citation.]" (*Solomon, supra,* 49 Cal.4th at p. 812.) However, " '*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' [Citations.]" (*Ibid.*)

As to the first *Anderson* category of evidence, defendant contends "there was no evidence of planning or preparation." We disagree. Planning activity is present when there are "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing." (*Anderson, supra,* 70 Cal.2d at p. 26.) Here, the evidence supported a finding that defendant obtained the knife from the kitchen prior to the stabbing. Although defendant testified that Melanie was the one who had placed the two knives in the bedroom out of fear for her safety, Kenneth testified that he had used that particular knife just a few days before the murder. Other members of the Dunn family testified that Melanie had never mentioned feeling unsafe in the neighborhood and that she had never mentioned keeping knives in her bedroom. (See *People v. Nazeri* (2010)

11

187 Cal.App.4th 1101, 1115 (*Nazeri*) [jury did not have to believe the defendant's testimony that one of the victims had brought a knife to the room where he stabbed her].) Further, defendant locked the bedroom door before stabbing Melanie, indicating he wanted to prevent anyone from coming to her aid.

As to the second *Anderson* category of evidence, defendant contends that there was no evidence he had a motive to kill Melanie. Again, we disagree. Motive is shown by "facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim." (*Anderson, supra,* 70 Cal.2d at p. 27.) Contrary to defendant's claim, the evidence supported a finding that defendant and Melanie had an increasingly antagonistic relationship. Melanie had been complaining about defendant, and she had instructed him to move out of the house. Melanie had slammed a door earlier that evening, during a fight about him moving out. The fight had continued through text messages and at least one phone conversation that night, with Melanie telling defendant that she not only wanted to date another man, but that she had already slept with other men. Numerous cases recognize that "a sexual-jealousy 'motive' " for a killing can support a finding of premeditation and deliberation. (See *Anderson, supra,* at p. 29; *Nazeri, supra,* 187 Cal.App.4th at p. 1117.) Thus, the record contains evidence from which the jury could infer that defendant had a motive to kill Melanie.

As to the manner of killing—the third *Anderson* category—defendant contends "there was nothing 'exacting' about the manner of this killing." The manner of killing will support a finding of premeditation and deliberation when it was "so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way." (*Anderson, supra,* 70 Cal.2d at p. 27.) In this case, defendant apparently put Melanie into a chokehold so as to prevent her from screaming or struggling effectively. Defendant then stabbed Melanie with a very sharp knife, using such great force that the knife went all the way through her neck,

cutting through her skin, esophagus, cartilage, vertebrae, and muscle, and even cutting his own arm. (Cf. *People v. Harris* (2008) 43 Cal.4th 1269, 1287 [sufficient evidence of premeditation where the defendant stabbed the victim "directly in the heart with enough force to penetrate part of a rib and pierce entirely through the heart"].) The superficial wounds indicating the knife had been dragged across Melanie's skin suggested that defendant took some time to aim the knife before plunging it into her neck, and the fact that there were two exit wounds suggested defendant partially withdrew the knife, then pushed it back in, to make sure it was a fatal wound. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1127 *(Perez)* [evidence the defendant inflicted post-mortem wounds "to make certain the victim was dead" was consistent with a premeditated murder, rather than with a " 'mere rash and unconsidered impulse' "].)

Defendant's behavior after the stabbing is also relevant. (See *Perez, supra,* 2 Cal.4th at p. 1128 ["the conduct of defendant *after* the stabbing . . . would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing"]; see also *Solomon, supra,* 49 Cal.4th at p. 812 [*Anderson* factors are not exclusive].) Here, after Melanie was stabbed in the neck, defendant did not attempt to render aid or call for help—conduct that was consistent with a premeditated and deliberate killing.

After the initial briefing in this case was completed, defendant wrote a letter to inform this court of a recent case, *People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*), in which a first degree murder conviction was reduced to second degree murder because there was insufficient evidence of premeditation and deliberation. In *Boatman,* the defendant shot his girlfriend in the face while they were alone in his bedroom. The *Boatman* defendant initially claimed the victim shot herself, then claimed that he had accidentally shot her. (*Id.* at pp. 1258-1259.) Regarding planning activity, there was no evidence the defendant had left the bedroom to get the gun. (*Id.* at p. 1267.) Following the shooting, he behaved like "someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan"—he had tried to

13

resuscitate the victim, directed his brother to call the police, cried, and made suicidal remarks. (*Ibid.*) Regarding motive, there was evidence from which the jury could infer the defendant was in a bad mood or had been angry with the victim, but no evidence of "a motive suggesting premeditation and deliberation." (*Id.* at p. 1268.) The manner of killing did not show premeditation without evidence of motive and planning because it was not an execution-style murder. (*Id.* at pp. 1269-1270.)

*Boatman* is distinguishable from the instant case. As explained above, there was evidence of planning activity here, because the evidence indicated defendant left the bedroom to get the knife he used in the murder. Following the shooting, defendant did not behave like "someone horrified and distraught about what he had done," but like "someone who had just fulfilled a preconceived plan"—he made no attempt to resuscitate Melanie, did not make any attempt to get help, did not cry, and did not make suicidal remarks. (See *Boatman, supra,* 221 Cal.App.4th at p. 1267.) There was much more evidence of motive here, since Melanie had not only asked defendant to move out but told him she wanted to see other people and had already slept with other people. Finally, the manner of killing in this case showed premeditation because it was akin to an execution-style murder.

In sum, the evidence was sufficient to support defendant's first degree murder conviction on a premeditation and deliberation theory.

## B.    *Prosecutorial Misconduct:  Reasonable Doubt Standard*

Defendant contends the prosecutor committed misconduct by misstating the reasonable doubt standard—specifically, the meaning of the term "abiding conviction"—during closing argument to the jury.

### 1.    Proceedings Below

Pursuant to CALCRIM No. 220, the trial court instructed the jury on the meaning of reasonable doubt as follows:  "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate

14

all possible doubt because everything in life is open to some possible or imaginary doubt."

The defense first brought up the meaning of "abiding conviction" during argument to the jury. Trial counsel stated, "I don't have a definition for abiding conviction, but I do know this. That when you leave the courtroom today and go home, you have your dinner, and you spend some time, and you start thinking, you know what, I might have made the wrong decision, or, wait, you know, actually, maybe it's possible it could have been this way, you start having that doubt, then you don't have an abiding conviction. A couple months down the line you start feeling maybe I didn't make the right decision there, then you didn't have an abiding conviction."

In closing argument, the prosecutor argued that trial counsel "wants to change the standard" for reasonable doubt to "not just what you think now, but what you think you might think in the future." The prosecutor argued that the jurors could not "live up to that standard," and that "that's not the standard." The prosecutor continued, "You are going to go back, you are going to deliberate, and you are going to know beyond a reasonable doubt the defendant committed first degree murder. And you know what? A week from now, a month from now, a year from now, you are going to know it too. But that's not the standard. The facts aren't going to change. But everybody second-guesses themself [*sic*] at some point. And the defense counsel is playing on that knowledge about human nature. It's a defense tactic. It's not like I haven't heard this argument before."

Trial counsel objected, but the trial court ruled, "It's argument."

### 2.	Analysis

The general rules applying to claims of prosecutorial misconduct are as follows: "Under the federal Constitution, to be reversible, a prosecutor's improper comments must ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] ' "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves

15

' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citations.]' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

Defendant contends the prosecutor misstated the law and diluted the reasonable doubt standard by telling the juror that it was "not the standard" for an abiding conviction that the jurors agree with their decision in the future. He points out that prior cases have held that the term "abiding conviction" conveys "the requirement that the jurors' belief in the truth of the charge must be both long lasting and deeply felt." (See *People v. Light* (1996) 44 Cal.App.4th 879, 885; *People v. Brigham* (1979) 25 Cal.3d 283, 290 [the term "abiding" conveys the "lasting, permanent nature of the conviction"].)

Defendant argues the prosecutor's comments were analogous to the argument disapproved by the court in *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*). In that case, the prosecutor argued that the reasonable doubt standard was " 'a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving.' " (*Id.* at p. 35.) The *Nguyen* court held that the prosecutor's argument was improper and that it "trivialize[d] the reasonable doubt standard." (*Id.* at p. 36.) However, the court concluded, the defendant "was not prejudiced since the prosecutor did direct the jury to read the reasonable doubt instruction and the jury was correctly instructed on the standard." (*Id.* at pp. 36-37.)

Here, the prosecutor did not compare the standard of guilt beyond a reasonable doubt to everyday decisions, so *Nguyen* is not on point. In this case, the arguments were more similar to those in *People v. Pierce* (2009) 172 Cal.App.4th 567 (*Pierce*). In *Pierce*, as in the instant case, the prosecutor disputed defense counsel's explanation of an

16

abiding conviction as one that is lasting.  Defense counsel had told the jury that an abiding conviction was " 'a permanent sort of a belief' " and that a juror could not " 'wake up the next day and think . . . I hope that I was right.' " (*Id.* at p. 570.)  The prosecutor later told the jury that the reasonable doubt instruction did not say " 'anything about tomorrow, the future, next week, or even ten minutes after your verdict.' " (*Ibid.*)  The prosecutor further told the jury that " 'when you're deliberating, when you've made your decision, that's when it counts.  There's no legal requirement of and we'll come back in a week and make sure you're all good with this.' " (*Id.* at p. 571.)

The *Pierce* court found "no reasonable likelihood" that the jury misconstrued or applied the prosecutor's remarks relating to " 'an abiding conviction.' " (*Pierce, supra,* 172 Cal.App.4th at p. 572; see also *id.* at pp. 581-582 [conc. opn. of Hull, Acting P.J.].)  The majority explained that the prosecutor's challenged statements had been brief and that the prosecutor had reiterated that CALCRIM No. 220 says " 'proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.' " (*Id.* at pp. 570; see also *id*. at p. 572.)  The majority noted it was irrelevant that "after the conclusion of the case one or more jurors might change their minds after learning something new." (*Id.* at p. 573*;* see also *id.* at p. 581 [conc. opn. of Hull, Acting P.J.].)  The court also noted that "the jury did not ask any questions concerning the instruction on reasonable doubt or the meaning of the concept of an abiding conviction." (*Ibid.*)

In the instant case, there is no "reasonable likelihood that the jury construed or applied" the prosecutor's remarks "in an objectionable fashion." (*Samayoa, supra,* 15 Cal.4th at p. 841.)  The prosecutor correctly told the jury that "abiding conviction" referred to "what you think now."  As in *Pierce,* the jury did not ask any questions about the meaning of reasonable doubt or about the term "abiding conviction."  Most importantly, the jury was correctly instructed on reasonable doubt, and we must presume the jury followed the instruction.  (See *Nguyen, supra,* 40 Cal.App.4th at pp. 36-37.)

In sum, we conclude that the prosecutor did not commit misconduct when discussing the meaning of reasonable doubt.

### C. *Ineffective Assistance of Counsel: Failure to Request CALCRIM No. 522*

Defendant contends trial counsel was ineffective for failing to request CALCRIM No. 522, which would have told the jury that provocation may reduce a murder from first degree to second degree.

CALCRIM No. 522 provides in pertinent part: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., [a reasonable probability] that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland* ).)

Defendant contends that the concepts stated in CALCRIM No. 522 were "critical to and totally consistent with the defense theory of this case." He points out that during closing argument, trial counsel described the "hurtful and provocative things" Melanie said to defendant, such as, "Your mother should have aborted you."

18

The Attorney General points out that trial counsel argued that the stabbing was an accident and that defendant was guilty of involuntary manslaughter or, at most, voluntary manslaughter. Thus, the Attorney General contends, the record indicates that trial counsel had a tactical reason for failing to request CALCRIM No. 522.

We agree with the Attorney General that the record reflects trial counsel may have had a sound tactical reason for not requesting CALCRIM No. 522: trial counsel did not want to give the jury a reason to return a murder verdict. In argument to the jury, trial counsel argued for a verdict of involuntary manslaughter, which was consistent with defendant's testimony about Melanie's stabbing death being an accident. After referring to Melanie's insults, trial counsel argued, "And then he made a horrible mistake. . . . He hit her hand. He pushed her hand. He thrusted his arm." Trial counsel argued that defendant did not have the intent to kill Melanie. Trial counsel argued that at most, the crime was voluntary manslaughter, and he advised the jury to carefully read the instructions on voluntary and involuntary manslaughter. It was not unreasonable for trial counsel to focus on seeking an involuntary or voluntary manslaughter verdict rather than give the jury a reason to convict defendant of murder.

In light of trial counsel's argument to the jury, defendant cannot show this record affirmatively discloses a lack of tactical purpose or satisfactory explanation for defense counsel's omission. "[T]he difference between [defense] counsel's approach and appellate counsel's hindsight analysis [of what defense counsel should have done] is simply one of tactics. . . ." (*People v. Morales* (1979) 88 Cal.App.3d 259, 268 (*Morales*).)

Trial counsel's failure to request CALCRIM No. 522 was also not prejudicial. The instruction would have informed the jury that it could consider any provocation in deciding whether the crime was first or second degree murder. But the jury already had to determine whether defendant acted willfully, deliberately, and with premeditation. Although the jury was not specifically told that provocation can be considered in making

19

that determination, the jury was also not limited in the evidence it could consider concerning premeditation and deliberation.  (See *People v. Rogers* (2006) 39 Cal.4th 826, 880.)  Moreover, there was overwhelming evidence that defendant premeditated and deliberated Melanie's killing; even defendant's own testimony – that Melanie's death was accidental – did not support a finding that he killed her with malice aforethought in response to provocation.

In sum, defendant has not shown trial counsel was ineffective for failing to request CALCRIM No. 522.

### D.    CALCRIM 521

Defendant contends the trial court erred by telling the jury, pursuant to CALCRIM No. 521, that defendant acted with premeditation if he decided to kill Melanie before *completing* the acts that caused her death.

Pursuant to CALCRIM No. 521, the jury was instructed as follows:  "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted willfully if he intended to kill.  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. *The defendant acted with premeditation if he decided to kill before completing the acts that caused death.*  [¶]  The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate or premeditated.  The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.  A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection, not the length of time."

Defendant contends that CALCRIM No. 521 improperly suggests that the premeditation required for first degree murder can be formed during, rather than before,

20

the defendant commits the act causing the victim's death. He notes that a previous version of that instruction used the phrase "before committing" rather than the phrase "before completing." (See CALCRIM No. 521 (2009-2010).)

The Attorney General contends the current version of CALCRIM No. 521 is not legally erroneous because a defendant could "commit a series of acts that, in conjunction with each other, cause death" or make a premeditated decision to kill in the course of an attack. The Attorney General cites two cases as examples of such situations. In *People v. Ainsworth* (1988) 45 Cal.3d 984 (*Ainsworth*), the California Supreme Court upheld a jury's finding of premeditated and deliberate murder "based on the theory that defendant knowingly and intentionally permitted the victim to bleed to death as he kept her captive during the lengthy car ride after the shooting." (*Id.* at p. 1023 [upholding denial of section 1118 .1 motion]; see *id.* at p. 1024 [upholding jury verdict on the basis of the same evidence].) The California Supreme Court reached a similar conclusion in *People v. Raley* (1992) 2 Cal.4th 870 (*Raley*), where the defendant stabbed the victims numerous times, then drove them around, beat them, and dumped their bodies in a ravine, after which one victim died. The court found sufficient evidence to support the jury's finding of premeditation and deliberation, explaining, "Even if we were to agree that it could only be concluded that the many stab wounds defendant inflicted on each woman were part of an unreflective explosion of violence, his calculated decision to let them bleed for the next 18 hours, to refuse medical attention, to beat them about the head and to dump them on a winter night into an isolated ravine supports the conclusion that he premeditated the death of [the murder victim]." (*Id.* at p. 888.)

The *Ainsworth* and *Raley* cases provide support for the "before completing" language of CALCRIM No. 521. Thus, the instruction was not legally incorrect, and it was incumbent upon defendant to request the trial court use different language when reading the instruction to the jury. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-

21

1012.)  As defendant did not request any modification to CALCRIM No. 521 below, he cannot now claim that the instruction was improper.

### E.    Ineffective Assistance of Counsel:  Prosecutor's Deliberation Argument

Defendant contends trial counsel was ineffective for failing to object when the prosecutor argued that evidence of what defendant did after stabbing Melanie showed that he deliberated her murder.

When the prosecutor introduced the concepts of premeditation and deliberation, he stated, "Premeditated means he decided to kill before completing the act that caused the death.  He thought about it beforehand.  It wasn't [that] he killed her and didn't think about it beforehand.  There is some sort of planning."  The prosecutor then described deliberation:  "Deliberation requires that the defendant carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill."

Later, the prosecutor discussed the evidence showing defendant intended to kill Melanie.  The prosecutor argued that "what he used . . . a 13-inch-long knife" and "the location of the wound" showed intent to kill.  The prosecutor also argued that "how he acted right after" showed defendant intended to kill Melanie:  "He doesn't call for help. He doesn't do anything that could potentially save her, despite the fact she has this mortal wound."

The prosecutor continued, "And, actually, if you think about it, while he's laying there with [Melanie], that's additional time that he is deliberating the fact that he wants her dead.  Because she isn't dead yet."  The prosecutor argued that defendant was "killing her slowly" by preventing anyone from coming to help.  The prosecutor further argued that while defendant was laying there, he was continuing to think, " 'I want her to die.' . . .  That's deliberation."

The prosecutor also argued that defendant had "plenty of time" to think about the murder, since Melanie left for work at 5:00 p.m. and was not killed until 5:00 a.m.  The

22

prosecutor argued that defendant had "more than four hours to cool down" after the last text from Melanie, which was sent at 11:58 p.m. The prosecutor argued that defendant, not Melanie, put the knives in the room "because he was thinking ahead. He was premeditating."

Defendant contends the prosecutor's argument distorted the law of deliberation and premeditation, and thus that trial counsel should have objected. However, as explained above, there was a legal basis for the prosecutor's argument. CALCRIM No. 521 correctly states that a defendant acts with premeditation and deliberation if he decides to kill before completing the acts that caused the victim's death. (See *Ainsworth, supra,* 45 Cal.3d at pp. 1023-1024; *Raley, supra,* 2 Cal.4th at p. 888.) "Defense counsel is not required to advance unmeritorious arguments on the defendant's behalf. [Citations.]" (*People v. McPeters* (1992) 2 Cal.4th 1148, 1173.) Thus, trial counsel was not ineffective for failing to object.

### F. Baseball Bat Incident

Defendant contends the trial court erred by allowing the prosecutor to introduce evidence that defendant had previously hit someone with a baseball bat, and by denying his subsequent motion for a mistrial. Defendant contends that the introduction of this evidence violated his rights to due process of law and a fair jury trial under the Fifth, Sixth, and Fourteenth Amendments. He also contends the evidence should have been excluded pursuant to Evidence Code section 352.

### 1. Proceedings Below

During motions in limine, defendant requested the trial court exclude evidence that defendant had a 2004 Virginia conviction of misdemeanor battery. Trial counsel asserted that defendant was "somewhere around 18 or 19 years old" in 2004. The prosecutor acknowledged that because the conviction was not a crime of moral turpitude, it was not admissible for impeachment purposes, but noted that "it may be relevant for other purposes." The trial court ruled that the conviction would not be admitted "at this time."

23

Although the details of that offense were not discussed at the time, it appears the offense involved a baseball bat.

During defendant's initial cross-examination, defendant asserted that he had "never been in this situation before" and therefore did not know what to do after the knife went into Melanie's neck. Upon further questioning, defendant denied ever seeing someone get killed "directly in front" of him, but he admitted someone had been killed in his presence. Specifically, he had seen "somebody get stabbed before."

During redirect examination, trial counsel asked defendant about "seeing someone who was stabbed before." Defendant explained that he was "there" when someone was killed. He explained that there had been a quickly escalating argument among people from his neighborhood, and that he had been "probably 12, 13, [or] 14" years old.

On further cross-examination, defendant reiterated that he had been young when he had seen someone killed. After being shown a previous statement, defendant acknowledged that he had also seen someone stabbed and killed when he was an adult, about four years prior to Melanie's death.

On further redirect examination, trial counsel asked defendant whether, even though he had seen "other people dying before, or getting attacked," he was prepared for what happened on the night of Melanie's death. Defendant responded, "No. Not at all." Trial counsel then asked whether defendant had been "either the aggressor or the victim at any of those times that someone has died?" Defendant responded, "No," and explained that he had been "[b]asically, the bystander."

On further cross-examination, the prosecutor asked defendant, "But you are not unfamiliar with being in the middle of hand-to-hand combat, are you?" Trial counsel objected on the basis of "[t]he motions in limine." The trial court overruled the objection, and defendant admitted he had been in fights with his siblings and possibly someone else. The prosecutor asked, "So you've been in stressful situations involving

24

violence before, correct?" Defendant responded that he had been "in stressful situations," but that he would "have to say be more specific for 'violence.' "

After a bench conference, the prosecutor asked defendant if he had ever hit a man with a baseball bat. Trial counsel objected, but the court overruled the objection. Defendant then responded, "It's happened before." Defendant acknowledged that "stress over violent situations isn't foreign."

On further redirect examination, defendant explained that back in the "early 2000's," he had been in "some type of altercation with a guy who had a baseball bat."

Defendant subsequently moved for a mistrial, arguing that the baseball bat incident had previously been excluded. The prosecutor responded that defendant had "opened the door" to the topic by claiming he had not known what to do when Melanie was stabbed because he had not been involved in anything like that before, and by claiming he had only seen someone harmed when he was young.

The trial court agreed that "the door was open" and denied the motion for a mistrial. The court specifically found that trial counsel had opened the door by asking defendant whether he had ever been the aggressor or the victim when he had seen someone dying or getting attacked. The court explained, "I'm not going to allow him to be cast in a false aura of nonviolence."

During argument to the jury, the prosecutor brought up the baseball bat incident when discussing defendant's behavior after the stabbing. The prosecutor noted that defendant had not called 9-1-1 and had "run away." The prosecutor further noted that defendant had explained his behavior by claiming he had never been in such a situation before, but that he later admitted seeing someone get killed when he was young and seeing someone get stabbed about four years earlier. The prosecutor added that defendant had also admitted having "some personal experience with this type of violence too, because he's got some experience with hitting somebody in the face with a bat." The

25

prosecutor argued that defendant "didn't freeze because he didn't know what to do. He just wanted to keep Melanie quiet until she died."

During the defense argument, trial counsel suggested that defendant's text exchanges about beating someone were possibly jokes. Trial counsel further suggested that the prosecutor was using those text messages and the baseball bat incident to indicate defendant was violent.

The prosecutor later responded to the defense argument: "So we aren't saying he's violent just because of a couple of jokes, if you want to call them that, in his text messages, or because he hit a man with a baseball bat when he was a teenager . . . . We are saying he's violent because he killed Melanie. [¶] And those other things, the text messages, the fact that he hit a guy with a baseball bat, that just supports the theory that he is violent. Right. That that is something he is capable of doing. We are not using it to say he's a violent person, but it's not character – it's not out of what we would expect."

### 2. Analysis

Defendant contends the evidence regarding the baseball bat incident was highly prejudicial evidence of his propensity for violence and thus should have been excluded. As noted above, defendant contends the error violated the federal constitution as well as state law.

"We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion. [Citation.]" (*People v. Harris* (2013) 57 Cal.4th 804, 841.) An erroneous exercise of discretion in the application of ordinary rules of evidence generally does not implicate the federal Constitution. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) "[T]he admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 436.)

26

Evidence Code section 1101, subdivision (a) states: "Except as provided in this section . . . , evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."

Evidence Code section 1101, subdivision (b) states: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

Evidence Code section 1101, subdivision (c) states: "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Here, defendant testified that Melanie was stabbed accidentally and that he had not tried to help her afterwards because he had "never been in this situation before." Defendant also testified that although he had seen "other people dying before, or getting attacked," he had been neither the aggressor nor the victim in any of those incidents; he had been a "bystander." The evidence of defendant's involvement in a prior violent incident was admissible to impeach his claim that he had only been a bystander during the prior violent incidents he had witnessed. In other words, "[t]he challenged evidence was directly relevant to impeach defendant's own testimony." (*People v. Doolin* (2009) 45 Cal.4th 390, 439; see Evid. Code, § 1101, subd. (c).) Under Evidence Code section 780, subdivision (i), a trial court may admit otherwise inadmissible evidence for impeachment purposes to prove or disprove the "existence or nonexistence of any fact" about which a witness has testified or opened the door. (See *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946 ["[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony."].) The open-the-door rule prevents witnesses from misleading the jury or

27

misrepresenting facts. (See *People v. Robinson* (1997) 53 Cal.App.4th 270, 282-283; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1267 [If " 'the defendant first seeks to mislead a jury or minimize the facts . . .' he may properly be questioned further."].)

Defendant alternatively contends that even if the evidence of the baseball bat incident was admissible for a legitimate purpose, the trial court should have excluded it pursuant to Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Even assuming that defendant raised this issue below, we find no abuse of discretion by the trial court in declining to exclude the evidence on this basis. (See *People v. Thomas* (2011) 51 Cal.4th 449, 485 [" 'A trial court's exercise of discretion in admitting or rejecting evidence pursuant to Evidence Code section 352 "will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice." ' "].)

The questions and testimony about the baseball bat incident were relatively brief and did not pose a significant potential for prejudice. Defendant testified that the baseball bat incident occurred a number of years before the charged offense (in the early 2000's) and he indicated that he had not been the initial aggressor in the baseball bat incident (since the other person originally had the baseball bat). On this record, we find no abuse of discretion in the trial court's decision to admit the evidence under Evidence Code section 352.

## G. Ineffective Assistance of Counsel: Baseball Bat Incident

Defendant contends trial counsel was ineffective for asking defendant questions that opened the door to introduction of the baseball bat incident and for failing to request a limiting instruction regarding the baseball bat incident.[6]

As noted above, a claim of ineffective assistance of counsel has two components: "the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.]" (*People v. Anderson, supra,* 25 Cal.4th at p. 569.)

The record indicates trial counsel had a tactical reason for asking defendant the questions that eventually opened the door to the admission of the baseball bat incident. The fact that defendant had done nothing to help Melanie after the knife went into her neck was a significant part of the prosecution's case, and the prosecution sought to exploit that fact during cross-examination. Defendant himself had asserted that he had "never been in this situation before," which opened the door for the prosecutor to ask questions about defendant's prior experiences with violent situations. Trial counsel tried to rehabilitate defendant during subsequent redirect examination, by eliciting the fact that his prior experiences had been in the past and had only involved him watching the incidents. Although this eventually enabled the prosecutor to impeach defendant with the baseball bat incident, we cannot say that trial counsel acted unreasonably in asking defendant questions designed to rehabilitate him. As previously noted, "the difference between [defense] counsel's approach and appellate counsel's hindsight analysis [of what defense counsel should have done] is simply one of tactics. . . ." (*Morales, supra,* 88 Cal.App.3d at p. 268.)

Defendant also fails to show a reasonable probability that " ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " ' "

---

[6] These issues are raised in defendant's supplemental opening brief.

(*People v. Anderson*, *supra*, 25 Cal.4th at p. 569.)  In light of the strong evidence that defendant was guilty of first degree murder, confidence in the outcome of trial is not affected by the admission of the evidence of the baseball bat incident.  The incident was not significant in light of the facts about defendant that were already known to the jury: that defendant had prior convictions, that he was on parole at the time of the incident, that he had texted his cousin about getting someone to beat Melanie's "ass," and that he had lied to the police.  Defendant's testimony about Melanie's death being an accident was inherently improbable and inconsistent with the medical testimony.  Defendant's testimony about the knife was contradicted by the testimony of Melanie's family.  The evidence presented at trial overwhelmingly established that defendant was angry with Melanie on the night of her death, that he obtained the knife that night, that he took her by surprise so she could not scream, that he plunged the knife all the way through her neck, and that he pulled the knife part way out and pushed it back in again.  On this record, even if trial counsel had not opened the door to admission of the baseball bat incident, the jury would still have reached a first degree murder verdict.

We also reject defendant's claim that trial counsel was ineffective for failing to request a limiting instruction regarding the baseball bat incident.  First, the baseball bat incident was admitted for impeachment purposes, not as other crimes evidence under Evidence Code section 1101, subdivision (b), so an instruction such as CALCRIM No. 375 (evidence of uncharged offenses to prove identity, intent, common plan, etc.) would not have been appropriate.  Second, "the decision not to request one was a reasonable tactical choice by defense counsel to avoid directing the jury to focus on the evidence [of the baseball bat incident]."  (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 934.)  Third, as explained above, the evidence of defendant's guilt of first degree murder was overwhelming and thus, even if trial counsel had requested a limiting instruction concerning the baseball bat incident, we conclude the jury would still have reached a first degree murder verdict.

In sum, we conclude trial counsel was not ineffective for asking defendant questions that opened the door to introduction of the baseball bat incident or for failing to request a limiting instruction regarding the baseball bat incident.

### H.    Cumulative Error

Defendant contends his conviction should be reversed because of the cumulative effect of the claimed trial errors, including the prosecutorial misconduct, the trial court's evidentiary rulings, and the ineffective assistance of counsel.  (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].)

Defendant first contends that the reasonable doubt standard was undermined by the prosecutor's argument regarding reasonable doubt and the trial court's overruling of trial counsel's objection to that argument.  We have concluded, however, that there is no "reasonable likelihood that the jury construed or applied" the prosecutor's remarks "in an objectionable fashion," and thus that there was no prosecutorial misconduct.  (See *Samayoa, supra,* 15 Cal.4th at p. 841.)

Defendant next contends there were three errors that specifically affected the jury's resolution of whether he was guilty of first or second degree murder:  (1) trial counsel's failure to request CALCRIM No. 522, which would have told the jury that provocation can reduce a murder from first degree to second degree; (2) the language of CALCRIM No. 521, which permitted the jury to find that premeditation occurred during the acts causing Melanie's death; and (3) the prosecutor's statement that deliberation could be based on defendant's conduct after the stabbing.  However, we have concluded that trial counsel had a tactical reason for failing to request CALCRIM No. 522 and that there was no legal error in giving CALCRIM No. 521 or in the prosecutor's argument about premeditation and deliberation.

Last, defendant contends that the admission of the baseball bat incident added to the cumulative prejudice by inflaming the jurors and making them more likely to convict

him of the maximum possible offense. However, we have concluded that the trial court did not abuse its discretion in permitting evidence of the baseball bat incident to be introduced, and that trial counsel was not ineffective for asking defendant a line of questions designed to rehabilitate him after he was cross-examined about his claim of having never been in a similar situation before, which eventually opened the door to introduction of the baseball bat incident. We have also concluded that trial counsel was not ineffective for failing to request a limiting instruction regarding the baseball bat incident.

Defendant notes that in *People v. Jandres* (2014) 226 Cal.App.4th 340, this court reversed the judgment based upon the cumulative impact of several errors committed during the trial. In that case, this court found that an uncharged act was erroneously admitted and that there were three instructional errors regarding that uncharged act. (*Id.* at pp. 357-359.) Here, we have found no errors to cumulate, and thus we reject defendant's claim of cumulative error.

## IV.  DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____

MÁRQUEZ, J.


_____

GROVER, J.